**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____

MITCHELL PINSLY, derivatively on behalf of JANUS CAPITAL GROUP, INC.,

      Plaintiff,

v.

STEVEN L. SCHEID,
RICHARD M. WEIL,
TIMOTHY K. ARMOUR,
PAUL F. BALSER,
ANDREW COX,
JEFFREY DIERMEIER,
J. RICHARD FREDERICKS,
DEBORAH GATZEK,
LAWRENCE KOCHARD,
ROBERT T. PARRY,
JOCK PATTON,
GLENN SCHAFER,
GREGORY A. FROST,
JONATHAN D. COLEMAN,
R. GIBSON SMITH, and
JAMES P. GOFF,

      Defendants,

and

JANUS CAPITAL GROUP, INC,

      Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND JURY DEMAND**

---

1.      This is a verified shareholder derivative complaint on behalf of nominal defendant

Janus Capital Group, Inc. ("Janus" or the "Company") against Janus's Board of Directors (the

"Board") and certain of Janus's current and former executive officers.  This action seeks to hold

defendants liable for breach of their fiduciary duties of candor, good faith and loyalty, unjust

enrichment, and aiding and abetting from 2010 to the present (the "Relevant Period") in connection with the award of excessive and unwarranted 2010 executive compensation.

## NATURE OF THE ACTION

2.      This action arises from defendants' unwarranted and excessive spending of Company (*i.e.*, stockholders') funds on executive compensation -- particularly the recent authorization by the Board of a $10 million "initial sign-on incentive" and $20 million in total compensation paid to the Company's new Chief Executive Officer ("CEO"), defendant Richard M. Weil ("Weil"). Additionally, the Board increased total executive compensation awarded to the top five senior officers of the Company by 41% from 2009 to 2010.

3.      During 2010, under the leadership of Weil (and the other executive officers), Janus's stock price actually decreased by approximately 7% despite the fact that the Dow Jones Industrial Average (the "Dow") actually increased by almost 9%.  Thus, under the leadership of the newly-wealthy defendant Weil, the price of the Company's stock lagged the Dow by nearly 16%.  Further, the price of the Company's stock still has not recovered and is currently approximately 30% down from 2009.

4.      Accordingly, given the relative precipitous drop in the Company's share price during 2010, there is doubt that the Board's decision to ***increase*** total 2010 executive compensation was reasonable, loyal, and awarded in good faith.  By increasing total 2010 executive compensation, the Board also violated Janus's pay-for-performance executive compensation policy, which was touted in Company proxies.  Thus, there is reason to doubt that the Board complied with its fiduciary duties and that its decisions were presumptively protected business judgments.

5.      Historically, defendants and, in particular, the Board's Compensation Committee (the "Compensation Committee") have represented publicly that the Company's executive compensation practices are firmly rooted in a "pay-for-performance" philosophy.  Most recently, in Janus's Proxy

Statement filed on March 16, 2011 (the "Proxy"), the Board represented that the goal of the Company's executive compensation programs is to "provide a strong and direct link between pay and both Company and individual performance."  Additionally the Board represented that "compensation of our most senior executives, those who have the greatest ability to influence Janus' performance, should be primarily based on Company and individual performance – an approach that reinforces the alignment of interests between our executives and our public and fund shareholders." Here, the Board and senior officers have actually diminished stockholder value, yet the Board increased 2010 executive compensation.

6.      Fortunately for Company shareholders, for the first time in the Company's history, a "say on pay" vote was conducted via the Proxy, whereby Janus shareholders were afforded the chance to voice their dissatisfaction with the Board's clear disregard for its own prior statements regarding executive compensation and the Company's dreadful stock performance.

7.      Notably, in the Proxy, the Board unsurprisingly recommended that shareholders approve the Board's executive compensation program.

8.      On April 29, 2011, Janus stockholders voted on the Board's proposed 2010 compensation for the Company's senior officers, and an overwhelming majority *rejected* the Board's 2010 recommendation.  In particular, only 59,890,647 votes were cast in favor of the compensation while 82,667,210 voted against it with 6,718,257 abstentions.   Accordingly, only 40% of stockholders voted in favor of 2010 compensation.

9.      Unfortunately for Janus stockholders, however, despite the adverse shareholder vote, which occurred approximately two months ago, the Board has not rescinded the excessive 2010 executive compensation, nor has the Board indicated any intention to do so.

10.      Notably, this entire disregard by the Board of the Company's financial performance

in making compensation decisions for 2010 did not go unnoticed by the press.  For instance, a May 25, 2011 *Reuters* article entitled "Analysis: Janus Faces Pay Pressure After Shareholder Vote" stated, *inter alia*, "If Janus fails to change its own pay now 'the risk is they would be viewed as being hypocritical.'"  In particular, the article states that "[s]ecurities fillings show Janus funds voted last year against management pay proposals at companies that include banks Wells Fargo & Co and Comerica Inc."

11.     Additionally, a May 30, 2011 article published in *Pensions & Investments* entitled "Janus CEO Weil Faces Uphill Climb in 2nd Year on Job" quoted defendant Weil as stating "[w]e know that we haven't yet delivered the results that we need to deliver."  The article further notes that defendant Weil recognizes that "turning around the money manager will be a multiyear process." The article also quotes defendant Weil as stating "no one in our business has unlimited permission to continue to underperform for our clients and neither do we.  We simply must improve those disappointing short-term results."  Regarding the negative say on pay vote, the article stated:

**Shareholders reject pay**

Adding to Mr. Weil's problems was the April 26 advisory vote by shareholders rejecting his $20 million 2011 compensation package as well as the pay of four other named Janus executive officers.

With the vote, Janus became one of only a handful of companies where executive pay was rejected. Proxy advisers Glass Lewis and Institutional Shareholder Services both urged shareholders to reject the pay packages, maintaining Janus' pay-for-performance criteria was inadequate.

Mr. Weil said he took the vote very seriously.

*"I see my job as to make sure that my pay and our firm compensation aligns with delivering good results for our investment clients and delivering good returns for our owners," he said. "My own compensation should respond to those metrics as should the rest of the firm."*

12.     Further, an article published in the *New York Times* on June 18, 2011 entitled

"Paychecks as Big as Tajikistan" (the "NY Times Article") stated that Janus "topped the list" of companies that compensated executives irrespective of performance.  In particular, the NY Times Article highlights that the Board awarded executive compensation that accounted for almost 2% of the Company's average market value during 2010 making it the *worst* offender of the 483 companies examined.  The NY Times Article went onto say:

> WHEN does big become excessive? If the question involves executive pay, the answer is "often."
>
> But despite the reams of figures about pay in any given year, shareholders often have to struggle to put those numbers into perspective. Companies typically hold up pay from previous years as a benchmark, but just how this paycheck stacks up against, say, a company's earnings or stock market performance is rarely laid out.
>
> Investors can run the numbers themselves, of course, but it's a pretty laborious process. As a result, pay for most public companies' top executives exists in a sort of vacuum, as far as investors are concerned. Shareholders know they pay a lot for the hired help, but a lot compared with what?
>
> Answers to that question come fast and furious in a recent, immensely detailed report in The Analyst's Accounting Observer, a publication of R. G. Associates, an independent research firm in Baltimore. Jack Ciesielski, the firm's president, and his colleague Melissa Herboldsheimer have examined proxy statements and financial filings for the companies in the Standard & Poor's 500-stock index. In a report titled "S.& P. 500 Executive Pay: Bigger Than ...Whatever You Think It Is," they compare senior executives' pay with other corporate costs and measures.
>
> It's an enlightening, if enraging, exercise. And it provides the perspective that shareholders desperately need, particularly now that they are being asked to vote on corporate pay practices.
>
> Let's begin with the view from 30,000 feet. Total executive pay increased by 13.9 percent in 2010 among the 483 companies where data was available for the analysis. The total pay for those companies' 2,591 named executives, before taxes, was $14.3 billion.
>
> That's some pile of pay, right? But Mr. Ciesielski puts it into perspective by noting that the total is almost equal to the gross domestic product of Tajikistan, which has a population of more than 7 million.
>
> Warming to his subject, Mr. Ciesielski also determined that 158 companies paid more in cash compensation to their top guys and gals last year than they paid in audit

fees to their accounting firms. Thirty-two companies paid their top executives more in 2010 than they paid in cash income taxes.

The report also blows a hole in the argument that stock grants to executives align the interests of managers with those of shareholders. The report calculated that at 179 companies in the study, the average value of stockholders' stakes fell between 2008 and 2010 while the top executives at those companies received raises. The report really gets meaty when it compares executive pay with items like research and development costs, and earnings per share.

The report, for instance, compared earnings per share with cash pay — just salary and bonus, if there is one. It identified 24 companies where cash compensation last year amounted to 2 percent or more of the company's net income from continuing operations.

***

***Eleven companies analyzed in the report gave top executives a combined pay package amounting to 1 percent or more of the companies' average market value over the course of the year. The Janus Capital Group, the mutual fund concern, topped the list, with pay totaling almost $41 million for five executives. This accounted for 1.95 percent of the company's average market value over 2010.***

***"To earn their keep," the report said, "managers would have to create stock market value in the full amount of their pay." The executives at Janus failed to increase value in 2010, when the stock closed out the year roughly where it had begun it. This year, the company's shares are down almost 30 percent.  Janus declined to comment.***

Mr. Ciesielski says he believes that shareholders need more context when it comes to pay practices — and that rule makers should improve pay reports. "The disclosures really are not sufficient to get people fired up," he said in an interview last week, "unless they add up the compensation and find out how it relates to other things."

"We need a different model," he added. "There is a real lack of information here about how shareholders' funds are being managed."

***

13.     Most egregiously, the Board cannot claim that prior to the negative vote that it was unaware of its suspect compensation practices.  Specifically, in 2009, Glass, Lewis & Co. ("Glass Lewis") ranked Janus's CEO as being the 15th most overpaid CEO in the country.  Critically, the Board's decision to again overcompensate its new, unproven CEO is particularly offensive given the

6

criticism the Board has previously received.

14.     By this shareholder derivative action, Plaintiff seeks to enforce Janus's rights with respect to the excessive 2010 executive compensation awarded by the Board to Janus's executive officers (including the CEO), and to recover damages and other relief (including, but limited to, reforming the Company's executive compensation practices to better-align stockholder/management interests going forward) on behalf of the Company.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

17.     Plaintiff Mitchell Pinsly ("Plaintiff") is a shareholder of Janus and has been continuously throughout the Relevant Period.  Plaintiff is a citizen of Pennsylvania.

18.     Nominal defendant Janus is a Delaware corporation headquartered in Denver, Colorado.  According to its public filings, Janus is a publicly owned asset management holding company with approximately $167.7 billion in assets under management.

19.     Defendant Steven L. Scheid ("Scheid") has served as Chairman of the Board since 2004. In addition, defendant Scheid has served as a director of the Company since 2002. Finally, defendant Scheid previously served as the Company's CEO from 2004 until 2006.   Upon information and belief, defendant Scheid is a citizen of Colorado.

20.     Defendant Weil has served as a director and CEO of the Company since 2010. Upon information and belief, defendant Weil is a citizen of Colorado.

21.     Defendant Timothy K. Armour ("Armour") has served as a director of the Company since 2008. In addition, defendant Armour served as a member of the Compensation Committee during the Relevant Period. Further, defendant Armour previously served as interim CEO of the Company from July 2009 until January 2010. Upon information and belief, defendant Armour is a citizen of Colorado.

22.     Defendant Paul F. Balser ("Balser") has served as a director of the Company since 2000. In addition, defendant Balser served as a member of the Compensation Committee during the Relevant Period. Upon information and belief, defendant Balser is a citizen of New York.

23.     Defendant Andrew Cox ("Cox") has served as a director of the Company since 2002. In addition, defendant Cox served as a member of the Compensation Committee during the Relevant Period. Upon information and belief, defendant Cox is a citizen of Colorado.

24.     Defendant Jeffrey Diermeier ("Diermeier") has served as a director of the Company since 2008. Upon information and belief, defendant Diermeier is a citizen of Florida.

25.     Defendant J. Richard Fredericks ("Fredericks") has served as a director of the Company since 2006. Upon information and belief, defendant Fredericks is a citizen of California.

26.     Defendant Deborah Gatzek ("Gatzek") has served as a director of the Company since 2004. Upon information and belief, defendant Gatzek is a citizen of California.

27.     Defendant Lawrence Kochard ("Kochard") has served as a director of the Company since 2008.  In addition, defendant Kochard served as a member of the Compensation Committee during the Relevant Period.  Upon information and belief, defendant Kochard is a citizen of Virginia.

28.     Defendant Robert T. Parry ("Parry") has served as a director of the Company since 2005.  Upon information and belief, defendant Parry is a citizen of California.

29.     Defendant Jock Patton ("Patton") has served as a director of the Company since 2007.  In addition, defendant Patton served as a member of the Compensation Committee during the Relevant Period.  Upon information and belief, defendant Patton is a citizen of Arizona.

30.     Defendant Glenn Schafer ("Schafer") has served as a director of the Company since 2007.  Upon information and belief, defendant Schafer is a citizen of California.

31.     Defendant Gregory A. Frost ("Frost") has served as the Company's CFO and Executive Vice President throughout the Relevant Period.  Upon information and belief, defendant Frost is a citizen of Colorado.

32.     Defendant Jonathan D. Coleman ("Coleman") has served as the Company's Co-Chief Investment Officer throughout the Relevant Period.   Upon information and belief, defendant Coleman is a citizen of Colorado.

33.     Defendant R. Gibson Smith ("Smith") has served as the Company's Co-Chief Investment Officer throughout the Relevant Period.  Upon information and belief, defendant Smith is a citizen of Colorado.

34.     Defendant James P. Goff ("Goff") has served as the Company's Director of Research throughout the Relevant Period.  Upon information and belief defendant Goff is a citizen of Colorado.

35.     Defendants Scheid, Weil, Armour, Baiser, Cox, Diermeier, Fredeericks, Gatzek,

Kochard, Parry, Patton, Schafer, Frost, Coleman, Smith, and Goff shall be collectively referred to herein as the "Defendants."

36.     Defendants Patton, Armour, Balser, Cox, and Kochard shall be collectively referred to herein as the "Compensation Committee Defendants."

## THE DUTIES OF JANUS'S DIRECTORS AND OFFICERS

37.     As directors and officers of Janus, Defendants owed fiduciary duties of candor, good faith and loyalty to the Company.  They are prohibited from engaging in self-dealing as well as unlawful corporate conduct, such as violations of the laws, rules and regulations applicable to Janus and its business.

38.     Defendants, because of their positions of control and authority as directors and/or officers of Janus, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their executive and directorial positions with Janus, Defendants knew or should have known that by increasing 2010 executive compensation while Janus's share price declined, they were breaching their fiduciary duties of candor, good faith, loyalty and reasonableness owed to Janus, as well as creating unjust enrichment.  Defendants also knew or should have known that by unanimously recommending shareholder approval of the 2010 executive compensation in the Proxy they were breaching their fiduciary duty of candor and violating the Board's stated, purported pay-for-performance executive compensation policy.

39.     At times relevant hereto, Defendants were the agents of each of the other Defendants and were at all times acting within the course and scope of such agency.

40.     Pursuant to the Company's Compensation Committee charter, the Compensation Committee Defendants were specifically obligated, *inter alia*, to:

> a.  Annually determine the compensation package of the CEO (and the other executive officers) including reviewing and approving corporate goals and

objectives and evaluating the CEO's performance in light of those goals and objectives; and

b.  Review and discuss with management the Company's compensation discussion and analysis required to be included in the Company's Proxy.

## AIDING AND ABETTING AND CONCERTED ACTION

41.    In committing the wrongful acts particularized herein, Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.  In addition to the wrongful conduct particularized herein as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

42.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein.  In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his, her, or its overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

43.    According to its public filings, "Janus is a publicly owned asset management holding company with approximately $167.7 billion in assets under management."

44.    Throughout the Relevant Period, the Board (and particularly, the Compensation Committee) has materially overcompensated Janus's senior executives and, most notably, its CEO, defendant Weil, irrespective of the Company's actual performance and the performance of its stock. The directors on the Board are directly responsible for this disconnect between management and stockholder interests.

45.    For instance, in 2010, the Company's top five executive's compensation rose by 41%,

despite the fact that Janus's stock price actually decreased by approximately 7% when the Dow actually increased by almost 9%. Thus, under the leadership of the newly-wealthy defendant Weil, the price of the Company's stock lagged the Dow by nearly 16%.

46.     As detailed herein, in light of, *inter alia*, the Board's repeated "pay-for-performance" statements (including those in the Proxy), and the drop in the Company's share price caused by this current management team (led by Weil), there is reason to doubt that: (a) the Board complied with its fiduciary duties; and/or (b) the Board's 2010 compensation decisions were protected business judgments. Plaintiff alleges that the Board's 2010 compensation decisions constituted a breach of their fiduciary duties of candor, good faith and loyalty, as well as causing Weil to be unjustly enriched.

**"Pay-For-Performance" at Janus**

47.     Defendants have represented publicly that Janus's executive compensation practices are firmly rooted in a "pay-for-performance" policy. For example, in the Proxy, the Board represented that the goal of the Company's executive compensation programs is to "provide a strong and direct link between pay and both Company and individual performance." Additionally the Board represented that "compensation of our most senior executives, those who have the greatest ability to influence Janus' performance, should be primarily based on Company and individual performance – an approach that reinforces the alignment of interests between our executives and our public and fund shareholders."

48.     Thus, in theory (and by Defendants' own admissions), when Janus achieves good operating performance, executive compensation should increase, and when Janus fails to meet these criteria, executive compensation should decrease. In practice, however, the Board has increased executive compensation dramatically even when Janus's share price decreases.

**Janus's 2010 Executive Compensation**

49.     In 2010, Janus's five highest paid Section 16 executive officers -- defendants Weil, Frost, Coleman, Smith, and Goff -- collectively received almost ***$41 million*** in executive compensation (or 41% more than awarded in 2009), as detailed below:

| Name | Salary | Non-Equity Incentive Plan Compensation | Stock and Option Awards | Total Compensation[1] |
|---|---|---|---|---|
| Weil | $458,333 | $3,500,000 | $15,999,996 | $20,337,868 |
| Frost | $400,000 | $660,000 | $200,197 | $1,293,087 |
| Coleman | $500,000 | $4,465,785 | $1,211,640 | $6,215,319 |
| Smith | $500,000 | $5,943,835 | $1,247,103 | $7,728,687 |
| Goff | $500,000 | $3,611,207 | 1,015,172 | $5,154,353 |
| **Total** | | | | **$40,729,314** |

50.     As discussed above, in 2010, despite this excessive compensation, Janus's share price decreased by approximately 7% and lagged the Dow by nearly 16% in 2010.  Further, the price of the Company's stock still has not recovered and is currently approximately 30% down from 2009.

**Janus's Shareholders Soundly Reject the Board's Recommended 2010 Executive Compensation**

51.     In the Proxy, the Board "recommended" to Janus shareholders that they should approve Janus's 2010 executive compensation, stating:

> **Proposal No. 3: Non-binding Advisory Vote Related to Executive Compensation.**
>
> ***
>
> **RESOLVED**, that the shareholders approve the compensation of the Company's named executive officers, as disclosed in the Compensation Discussion and Analysis, the compensation tables, and any related material disclosed in this Proxy Statement.

---

[1] Total Compensation includes the following:  Salary, Restricted Stock Awards, Option Awards, Non-Equity Incentive Plan Compensation, and All Other Compensation (as defined in the Proxy).

Approval of Proposal No. 3, which begins on page 71, requires the affirmative vote of a majority of the shares present or represented by proxy at the Annual Meeting and entitled to vote on this proposal.

**THE BOARD OF DIRECTORS RECOMMENDS THAT THE SHAREHOLDERS VOTE "FOR" PROPOSAL NO. 3, APPROVING A NON-BINDING ADVISORY VOTE ON OUR NAMED EXECUTIVE OFFICERS' COMPENSATION.**

52.     Critically, the Board also affirmatively represented that "the Board and its Compensation Committee value the opinions that our shareholders express in their votes."

53.     On April 29, 2011, Janus stockholders voted on the Board's proposed 2010 compensation for the Company's senior officers, and an overwhelming majority *rejected* the Board's 2010 recommendation.  In particular, only 59,890,647 votes were cast in favor of the compensation while 82,667,210 voted against it with 6,718,257 abstentions.    Accordingly, only 40% of stockholders voted in favor of 2010 compensation.  This was the first time Janus's shareholders had ever been afforded the opportunity to voice their objection to the compensation awarded to the executive officers of the Company via the advisory vote procedure.

54.     The Board's claims that it purportedly "value[s] the opinions that our shareholders express in their votes" have, through their own inaction and silence, been exposed as mere lip-service.  Indeed, it has been approximately two months since the Board received the negative vote regarding executive compensation and, upon information and belief, they have done nothing (including issuing any response whatsoever to Janus shareholders) regarding it.  In fact, the Board has completely ignored the negative vote.

55.     Notably, this entire disregard by the Board of the Company's financial performance in making compensation decisions for 2010 did not go unnoticed by the press.  For instance, a May 25, 2011 *Reuters* article entitled "Analysis: Janus Faces Pay Pressure After Shareholder Vote" stated, *inter alia*, "If Janus fails to change its own pay now 'the risk is they would be viewed as

being hypocritical.'" In particular the article states that "[s]ecurities fillings show Janus funds voted last year against management pay proposals at companies that include banks Wells Fargo & Co and Comerica Inc." The article further indicates that the Board would not respond to requests for comment on the vote. Specifically, the article states:

> In a sample of 10 proxy measures that were critical of executive pay plans, Janus funds sided with shareholders 81 percent of the time -- the fifth most aggressive of 26 fund companies studied.

> "It looks like someone in their company knows how to evaluate executive compensation," said Lisa Lindsley, who runs the union's corporate governance efforts. "Maybe they should tap into that" expertise, she added.

> Janus faces trouble at home. Its shares have fallen 22 percent so far this year, the most of peers, as it has reported continued outflows from investors concerned about the mixed performance of some of its equity funds.

> The company hired former Pimco executive Richard Weil as chief executive officer to turn things around. He arrived on February 1, 2010, and received $20.3 million for that year, including a signing bonus of $10 million in restricted stock vesting over three years, according to Janus' proxy filing.

> \*\*\*

> SHAREHOLDER SETBACK

> Still, stockholders were not happy. In the advisory vote at the company's annual meeting on April 28, 82.7 million shares were cast against the executive pay proposal, and 59.9 million shares were voted for it. Those results were not a surprise after ISS, the influential advisory unit of MSCI Inc (MSCI.N), recommended an "against" vote.

> In a report, ISS said Weil's new-hire package **"appears overly generous for a newly appointed CEO" and that the $10 million was "unacceptable to shareholders due to the lack of disclosure and rationale provided" in the proxy.**

> **Janus board members either did not respond to requests for comment or referred questions to a company spokesman. In the proxy, Janus said a compensation redesign was under way.**

> The filing said the company would gradually implement a plan that would tie the aggregate bonus pool to a percentage of its profit, while individual incentive

compensation will still be based on both quantitative performance metrics and qualitative assessments.

*"Prior to the vote, we were aware of some shareholder concerns," spokesman James Aber said, "and we have been working with our board on implementing responsive changes."*

\*\*\*

56.     Additionally, a May 30, 2011 article published in *Pensions & Investments* entitled "Janus CEO Weil Faces Uphill Climb in 2nd Year on Job" quoted defendant Weil as stating "[w]e know that we haven't yet delivered the results that we need to deliver." The article further notes that defendant Weil recognizes that "turning around the money manager will be a multiyear process." The article also quotes defendant Weil as stating "no one in our business has unlimited permission to continue to underperform for our clients and neither do we. We simply must improve those disappointing short-term results." Regarding the negative say on pay vote, the article stated:

**Shareholders reject pay**

Adding to Mr. Weil's problems was the April 26 advisory vote by shareholders rejecting his $20 million 2011 compensation package as well as the pay of four other named Janus executive officers.

With the vote, Janus became one of only a handful of companies where executive pay was rejected. Proxy advisers Glass Lewis and Institutional Shareholder Services both urged shareholders to reject the pay packages, maintaining Janus' pay-for-performance criteria was inadequate.

Mr. Weil said he took the vote very seriously.

*"I see my job as to make sure that my pay and our firm compensation aligns with delivering good results for our investment clients and delivering good returns for our owners," he said. "My own compensation should respond to those metrics as should the rest of the firm."*

57.     Further, the NY Times Article stated that Janus "topped the list" of companies that compensated executives irrespective of performance. In particular, the NY Times Article highlights that the Board awarded executive compensation that accounted for almost 2% of the Company's

average market value during 2010 making it the *worst* offender of the 483 companies examined.

The NY Times Article went onto say:

> WHEN does big become excessive? If the question involves executive pay, the answer is "often."

> But despite the reams of figures about pay in any given year, shareholders often have to struggle to put those numbers into perspective. Companies typically hold up pay from previous years as a benchmark, but just how this paycheck stacks up against, say, a company's earnings or stock market performance is rarely laid out.

> Investors can run the numbers themselves, of course, but it's a pretty laborious process. As a result, pay for most public companies' top executives exists in a sort of vacuum, as far as investors are concerned. Shareholders know they pay a lot for the hired help, but a lot compared with what?

> Answers to that question come fast and furious in a recent, immensely detailed report in The Analyst's Accounting Observer, a publication of R. G. Associates, an independent research firm in Baltimore. Jack Ciesielski, the firm's president, and his colleague Melissa Herboldsheimer have examined proxy statements and financial filings for the companies in the Standard & Poor's 500-stock index. In a report titled "S.& P. 500 Executive Pay: Bigger Than ...Whatever You Think It Is," they compare senior executives' pay with other corporate costs and measures.

> It's an enlightening, if enraging, exercise. And it provides the perspective that shareholders desperately need, particularly now that they are being asked to vote on corporate pay practices.

> Let's begin with the view from 30,000 feet. Total executive pay increased by 13.9 percent in 2010 among the 483 companies where data was available for the analysis. The total pay for those companies' 2,591 named executives, before taxes, was $14.3 billion.

> That's some pile of pay, right? But Mr. Ciesielski puts it into perspective by noting that the total is almost equal to the gross domestic product of Tajikistan, which has a population of more than 7 million.

> Warming to his subject, Mr. Ciesielski also determined that 158 companies paid more in cash compensation to their top guys and gals last year than they paid in audit fees to their accounting firms. Thirty-two companies paid their top executives more in 2010 than they paid in cash income taxes.

> The report also blows a hole in the argument that stock grants to executives align the interests of managers with those of shareholders. The report calculated that at 179 companies in the study, the average value of stockholders' stakes fell between 2008

17

and 2010 while the top executives at those companies received raises. The report really gets meaty when it compares executive pay with items like research and development costs, and earnings per share.

The report, for instance, compared earnings per share with cash pay — just salary and bonus, if there is one. It identified 24 companies where cash compensation last year amounted to 2 percent or more of the company's net income from continuing operations.

***

*Eleven companies analyzed in the report gave top executives a combined pay package amounting to 1 percent or more of the companies' average market value over the course of the year. The Janus Capital Group, the mutual fund concern, topped the list, with pay totaling almost $41 million for five executives. This accounted for 1.95 percent of the company's average market value over 2010.*

"To earn their keep," the report said, "managers would have to create stock market value in the full amount of their pay." The executives at Janus failed to increase value in 2010, when the stock closed out the year roughly where it had begun it. This year, the company's shares are down almost 30 percent.  Janus declined to comment.

Mr. Ciesielski says he believes that shareholders need more context when it comes to pay practices — and that rule makers should improve pay reports. "The disclosures really are not sufficient to get people fired up," he said in an interview last week, "unless they add up the compensation and find out how it relates to other things."

"We need a different model," he added. "There is a real lack of information here about how shareholders' funds are being managed."

***

58.    Most egregiously, the Board cannot claim that prior to the negative vote that it was unaware of its suspect compensation practices.  Specifically, in 2009, the Glass Lewis ranked Janus's CEO as being the 15th most overpaid CEO in the country.  Additionally, the above-quoted *Reuters* article quoted Company spokesman James Aber as stating "[p]rior to the vote, we were aware of some shareholder concerns…and we have been working with our board on implementing responsive changes."  Critically, the Board's decision to again overcompensate its new, unproven CEO is particularly offensive given the criticism the Board has previously received.

18

## DAMAGES TO JANUS

59.     Janus has been damaged by the Board's awards of unwarranted, outsized executive compensation.  In 2010, the Company's share price steeply lagged behind the Dow, yet, incredibly, executive compensation for Company's executive officers increased by almost 41%.  Additionally, the Board bestowed upon its new CEO a $10 million signing bonus and $20 million in total compensation, which given the Company's paltry performance was unwarranted.  When for the first time given the opportunity to offer their own independent judgment of the Company's executive compensation, a majority of Janus's voting shareholders firmly rejected the 2010 executive compensation (and rightfully so).  Yet, even in the face of this visceral reaction by Janus's shareholders, the Board has not altered or amended the 2010 compensation, to the detriment of the Company and its stockholders.  In fact, the Board has not even ***acknowledged*** the shareholders' significant rejection of 2010 compensation.  By contrast, the Janus executives who received excessive 2010 compensation have been unjustly enriched.

60.     By this derivative action, Plaintiff seeks to recover damages and other relief for Janus against Defendants for their breaches of fiduciary duties of candor, good faith and loyalty, and for unjust enrichment.  Absent this action, as the Board has already amply demonstrated, the Company's rights against its wayward fiduciaries will not be exercised to the further detriment of the Company.

## DERIVATIVE AND DEMAND ALLEGATIONS

61.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

62.     Plaintiff brings this action derivatively on behalf of Janus to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of Defendants' misconduct. Plaintiff is a current holder of Janus common stock and will adequately represent the interests of the Company in this litigation.

63.     The Board is currently comprised of the following directors: defendants Scheid, Weil,

Armour, Balser, Cox, Diermeier, Fredericks, Gatzek, Kochard, Parry, Patton, and Schafer.

64.     A pre-suit demand upon the Board is a useless and futile action, and therefore, excused for several reasons.  First, the Board has both unanimously recommended to Janus's shareholders that they approve Janus's excessive 2010 executive compensation and failed to take any action once their recommendation was rejected.  As detailed above, Janus's share price decreased in 2010 (and continues to decrease) and steeply lagged the Dow.  Yet, despite the purported pay-for-performance executive compensation policy, the Board inexplicably increased 2010 executive compensation and bestowed upon its new CEO the incredibly lucrative package described herein. There is doubt that the Board's 2010 compensation decisions were reasonable, loyal and made in good faith, and are presumptively protected business judgments because those decisions violated Janus's pay-for-performance policy.  Accordingly, a pre-suit demand is useless and futile under the circumstances of this case, and therefore, excused.

65.     Second, a pre-suit demand is excused because the entire Board recommended publicly that Janus's shareholders unanimously approve Janus's 2010 executive compensation, including the lucrative compensation packaged bestowed on defendant Weil.  On April 29, 2011, a majority (60%) of Janus's voting shareholders rejected Janus's 2010 executive compensation.  Yet, the Board has not altered or otherwise amended the 2010 executive compensation, nor indicated that it has any intention of doing so.  By first recommending that the Company's stockholders approve the excessive 2010 executive compensation, and then failing to take any action whatsoever in the face of the adverse stockholder vote, the Board has openly demonstrated its hostility to this action and that a pre-suit demand upon it to take such action is a useless and futile act.  Accordingly, demand is excused.

66.     Pre-suit demand on defendant Weil is excused because his principal professional

occupation is his employment as the CEO of Janus.  Accordingly, Weil has received and continues to receive substantial monetary compensation and other valuable benefits (including the excessive compensation complained of herein).  Thus, Weil lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

67.     Moreover, Weil received excessive and unwarranted executive compensation in 2010, and, as a result, was the direct recipient of financial benefits from the misconduct challenged herein that were not shared with Janus's stockholders.  Thus, Weil is directly interested in a demand, and accordingly, pre-suit demand upon Weil is excused.

68.     Defendants Patton, Armour, Balser, Cox, and Kochard are interested in a demand as a result of their conduct on the Compensation Committee.  Pursuant to the Company's Compensation Committee Charter, directors on the Compensation Committee are responsible for, *inter alia*, setting executive compensation and reviewing among other things, Janus's performance relative to the performance metrics that formulate the Company's executive compensation programs.  Defendants Patton, Armour, Balser, Cox, and Kochard breached their fiduciary duties of due care, loyalty, and good faith, because the Compensation Committee, *inter alia*, awarded the above-discussed increased 2010 executive compensation, which was wholly divorced from the Company's performance.  Further, the Compensation Committee has done nothing to rectify its above failures, despite the sound rejection of the Company's 2010 compensation by 60% of its stockholders.  Therefore, defendants Patton, Armour, Balser, Cox, and Kochard (if not the entire Board) each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

69.     A pre-suit demand is further excused because a majority of the Board either was at

fault for the misconduct described herein and/or is liable for the misconduct described herein.  As

such, the Board members are disabled as a matter of law from objectively considering any pre-suit

demand, rendering demand futile and excused.

### FIRST CAUSE OF ACTION
**Against Defendants for Breach of Fiduciary Duty in Connection For the Issuance of False and Misleading Statements**

70.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

71.     Each of the Defendants was a director and/or officer of Janus and as such owed to

Janus the highest duty known to the law.  Each of the Defendants agreed to and did participate in

and/or aided and abetted one another in a deliberate course of action designed to divert corporate

assets in breach of the fiduciary duties these defendants owed to Janus.

72.     As demonstrated by the allegations above, the Defendants breached their fiduciary

duties of loyalty, good faith, candor and independence owed to Janus and its shareholders, and failed

to disclose material information and/or made material misrepresentations to shareholders regarding

Janus's 2010 executive compensation scheme.

73.     The Defendants have violated fiduciary duties of care, loyalty, good faith, candor and

independence owed to Janus and its shareholders, have engaged in unlawful self-dealing and have

acted to put their personal interests and/or their colleagues' interests ahead of the interests of Janus

and its shareholders.  As directors and/or officers of Janus, the Defendants participated in the

wrongful acts alleged herein.  They thereby breached their fiduciary duties to Janus's shareholders.

74.     As corporate fiduciaries, the Defendants owed Janus and its shareholders a duty of

candor and full and accurate disclosure.  As a result of the conduct complained of, the Defendants

made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material

facts from Janus's shareholders despite their duties to, *inter alia*; disclose the true facts regarding

Janus.  Thus they have violated their duty of candor.

75.    In committing the wrongful acts particularized herein, the Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

76.    At all relevant times, the Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was overpaying its directors, officers and employees via compensation plans premised on an illusory "pay for performance" executive compensation scheme; and (ii) maintain their directorial and executive positions at Janus and the profits, power and prestige which they enjoyed as a result of these positions.

77.    In particular, in the Proxy (and other filings), the Board represented the goal of the Company's executive compensation programs is to "provide a strong and direct link between pay and both Company and individual performance."  Despite this (and other) representations, when the price of the Company's stock declined (and steeply lagged the Dow) the Board inexplicably increased total executive compensation.  Accordingly, it is clear that the Board's repeated statements that it pays for performance were false and misleading.

78.    Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

79.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward Janus and its public shareholders, harming Janus.

## SECOND CAUSE OF ACTION
### Against Defendants for Breach of Fiduciary Duty in Connection with the Board's Compensation Practices

80.    Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

81.    Each of the Defendants was a director and/or officer of Janus and as such owed to

Janus the highest duty known to the law.  Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these defendants owed to Janus.

82.     As demonstrated by the allegations above, the Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to Janus and its shareholders by failing to adhere to the Company's purported pay-for-performance philosophy.  In particular, the Board repeatedly represented the goal of the Company's executive compensation programs is to "provide a strong and direct link between pay and both Company and individual performance."  Despite this (and other) representations, when the price of the Company's stock declined (and steeply lagged the Dow) the Board inexplicably increased total executive compensation.  This increase in executive compensation in direct contravention of the Board's stated pay for performance philosophy was a breach of the Board's fiduciary duties.

83.     The Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to Janus and its shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Janus and its shareholders.  As directors and/or officers of Janus, the Defendants participated in the wrongful acts alleged herein.  They thereby breached their fiduciary duties to Janus's shareholders.

84.     In committing the wrongful acts particularized herein, the Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

85.     Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

86.     By reason of the foregoing acts, practices and course of conduct, the Defendants have

failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward Janus and its public shareholders, harming Janus.

### THIRD CAUSE OF ACTION
**Against Defendants for Breach of Fiduciary Duty in Connection with the Board's Failure to Respond to the Negative Say on Pay Vote**

87.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

88.     Each of the Defendants was a director and/or officer of Janus and as such owed to Janus the highest duty known to the law.  Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these defendants owed to Janus.

89.     As demonstrated by the allegations above, the Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to Janus and its shareholders by failing to amend or alter 2010 executive compensation (or even issue a response) in connection with the negative say on pay vote.  In particular, despite having their executive compensation program approved by a mere 40% of stockholders, the Board has done nothing in response, in direct violations of their fiduciary duties.

90.     The Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to Janus and its shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Janus and its shareholders.  As directors and/or officers of Janus, the Defendants participated in the wrongful acts alleged herein.  They thereby breached their fiduciary duties to Janus's shareholders.

91.     In committing the wrongful acts particularized herein, the Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

92.     Defendants' misconduct was not due to an honest error of judgment, but rather their

bad faith and was done knowingly, willfully, intentionally or recklessly.

93.     By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward Janus and its public shareholders, harming Janus.

### FOURTH CAUSE OF ACTION
### Against All Defendants for Unjust Enrichment

94.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

95.     As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of Janus, in the form of unjustified salaries, benefits, stock option grants and other emoluments of office.

96.     All the payments and benefits provided to the Defendants based upon or related to Defendants' executive compensation scheme were unjustly awarded and at the expense of Janus, resulting in substantially unearned benefits.

97.     Defendants should be ordered to disgorge the gains which they have and/or will unjustly obtain and/or a constructive trust should be imposed for the benefit of the Company.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against Defendants and in favor of Janus for the amount of damages sustained by the Company as a result of Defendants' violation of state law;

B.     Extraordinary equitable and/or injunctive relief as necessary or permitted by law, equity and the statutory provisions sued hereunder, including disgorgement, attachment, impoundment, imposition of a constructive trust on or otherwise restricting the disposition/exercise of improvidently awarded executive compensation based upon false financial reporting and/or the proceeds of Defendants' trading activities or their other assets so as to ensure that Plaintiff on behalf of Janus has an effective remedy;

C.      Ordering the implementation and administration of internal controls and systems at Janus designed to prohibit and prevent excessive and/or unwarranted executive compensation payments to Janus's CEO and other senior executives;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, and accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  July 1, 2011

                                        **THE SHUMAN LAW FIRM**

                                        *s/ Kip B. Shuman*
                                        KIP B. SHUMAN
                                        RUSTY E. GLENN
                                        801 East 17th Avenue
                                        Denver, CO 80218
                                        Phone: (303) 861-3003
                                        Fax: (303) 830-6920

                                        **THE WEISER LAW FIRM, P.C.**
                                        ROBERT B. WEISER
                                        BRETT D. STECKER
                                        JEFFREY J. CIARLANTO
                                        JOSEPH M. PROFY
                                        121 N. Wayne Avenue, Suite 100
                                        Wayne, PA 19087
                                        Telephone:  (610) 225-2677
                                        Facsimile:  (610) 225-2678

                                        ***Counsel for Plaintiff***

## JANUS CAPITAL GROUP, INC. VERIFICATION

I, Mitchell Pinsly, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 6·24·2011

Mitchell Pinsly